**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**DEBORAH ELLEN YOUKERS,**

      **Plaintiff,**

**v.**                                **Case No.: 3:12-cv-09651**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the**
**Social Security Administration,**

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Claimant's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 11, 12).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for

1

judgment on the pleadings be **DENIED**, that the Commissioner's motion for judgment on the pleadings be **GRANTED**, and that this case be **DISMISSED, with prejudice,** and removed from the docket of the Court.

## I.    Procedural History

Plaintiff, Deborah Ellen Youkers ("Claimant"), filed applications for SSI and DIB in April 2010, alleging a disability onset date of September 1, 2009 due to a "major mass" in her chest and back. (Tr. at 162, 171, 187). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 31). Claimant filed a request for an administrative hearing, which was held on September 22, 2011 before the Honorable Benjamin R. McMillion, Administrative Law Judge ("ALJ"). (Tr. at 50-80). By written decision dated November 22, 2011, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 31-44). Claimant filed a request for review by the Appeals Council and submitted new evidence in support of her claim, which was incorporated into the administrative record. (Tr. at 6, 517-34). The ALJ's decision became the final decision of the Commissioner on October 23, 2012, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3). Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2, 7). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, (ECF Nos. 8, 9), and both parties filed memoranda in support of judgment on the pleadings. (ECF Nos. 11, 12). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 40 years old at the time she filed the instant applications for benefits and 41 years old at the time of the administrative hearing. She completed the eleventh

grade in school and communicates in English. (Tr. at 54). Claimant's past relevant work includes cashier/sales associate at Walmart; oven-tender at a pizza restaurant; and a cashier/clerk. (Tr. at 54-56).

## III.   **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this

determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of

4

decompensation of extended duration[1]) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental function. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

---

[1] Section 12.00(C)(4) of the Listing defines episodes of decompensation of extended duration as follows:

> Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

> The term repeated episodes of decompensation, each of extended duration, in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2014. (Tr. at 33, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since September 1, 2009, the alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ determined that Claimant had the following severe impairments: "history of mass in chest, with marked resolution; history of mass in back; migraines; major depressive disorder; and post-traumatic stress disorder (PTSD)." (Tr. at 34, Finding No. 3). Under the third inquiry, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 34-35, Finding No. 4). Accordingly, the ALJ assessed Claimant's RFC, finding that:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can occasionally climb ramps or stair, balance, stoop, kneel, crouch, and crawl, but she can never climb ladders, ropes, or scaffolds. In addition, the claimant should avoid concentrated exposure to extreme heat, cold, fumes, odors, dusts, gases, and poor ventilation, as well as avoiding all exposure to hazards. Lastly, she can have occasional interaction with the public and coworkers.

(Tr. at 36-42, Finding No. 5). The ALJ determined that Claimant was unable to perform any past relevant work. (Tr. at 42, Finding No. 6). He then reviewed Claimant's prior work experience, age, and education in combination with her RFC to determine Claimant's ability to engage in substantial gainful activity. (Tr. at 42-43, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1970 and was defined as a younger individual; (2) she had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability

determination. (Tr. at 42, Finding Nos. 7-9). Given these factors and Claimant's RFC, the ALJ relied upon the testimony of a vocational expert in finding that Claimant could perform jobs at the light and sedentary exertional levels, which were available in significant numbers in the national economy. (Tr. at 42-43, Finding No. 10). The ALJ found that Claimant was able to perform the jobs of routing clerk and price marker at the light level; and inspector and sorter at the sedentary level. (Tr. at 43). Therefore, the ALJ concluded that Claimant was not disabled and, thus, was not entitled to benefits. (Tr. at 43, Finding No. 11).

## IV.   <u>Claimant's Challenge to the Commissioner's Decision</u>

Claimant raises two challenges to the Commissioner's decision. (ECF No. 11 at 2). First, she argues that the ALJ failed to properly consider the findings of an examining psychologist, who opined that Claimant had moderate impairments to her persistence, concentration, and recent memory. Second, Claimant contends that the ALJ erroneously disregarded testimony of the vocational expert in which he agreed that moderately impaired concentration, attention, persistence, processing speed, and recent memory would affect Claimant's ability to perform the jobs identified by the vocational expert as appropriate for Claimant. (*Id.* at 3-5).

In response, the Commissioner points out that Claimant did not initially include mental impairments as causes of her alleged disability; instead, she claimed only that a mass in her chest and back prevented her from working. (ECF No. 12 at 2). Moreover, Claimant had no mental health treatment during the relevant time period. She was able to concentrate during the entirety of an administrative hearing that lasted well over an hour, and could recall details from an employment position that she held fourteen years earlier. According to the Commissioner, the ALJ gave good reasons as to why Claimant's mental

health impairments were not disabling, and his reasons were supported by the evidence as a whole.

## V.   <u>Relevant Medical History</u>

The undersigned has reviewed the evidence of record in its entirety, including the medical records. However, as the issues in dispute are limited to Claimant's mental impairments, only records pertinent to Claimant's psychological condition are summarized below.

### A.   *Treatment Notes*

The record reflects that Claimant has never received treatment from a psychologist or psychiatrist, nor has she been admitted to an acute care facility for psychiatric care. On April 3, 2009, Claimant presented to a local hospital, complaining of left-sided chest pain, dizziness, and shortness of breath. (Tr. at 313). She appeared very anxious, but she denied suffering from depression and took no psychotropic medications. (Tr. at 300, 313). Claimant returned to the hospital on September 21, 2009 and October 4, 2009 with right-sided abdominal pain, and on both occasions denied having depression or taking psychotropic medications. (Tr. at 276, 281). In fact, she had no mental health complaints at all. (Tr. at 294).

On October 27, 2009, Claimant was examined by Dr. R. Michael Kennerly regarding an abnormal CT scan of her chest. (Tr. at 265-67). Dr. Kennerly reported that Claimant was taking Xanax, an anti-anxiety medication, but the record is silent as to the reason for the prescription. Claimant did not make any psychiatric complaints, and no evaluation of her mental status was performed.

On November 5, 2009, Claimant returned to the hospital with right posterior lung and right knee pain. (Tr. at 268). On this visit, she advised the emergency department

physician that she had recently undergone biopsies of her lung and knee due to the presence of masses. (Tr. at 272). Claimant reported depression, but did not indicate that she was receiving any medications or psychological treatment for that condition. (Tr. at 268). The lung mass was ultimately diagnosed as a schwannoma.[2]

On December 4, 2009, Claimant's primary care physician, Dr. Wesley Lieving, completed a disability form for the Hartford Life Insurance Company in which he opined that Claimant was unable to work until further notice due to a right thoracic schwannoma, causing numbness and intermittent motor weakness. (Tr. at 346). He added that Claimant had secondary diagnoses of abdominal pain, chronic obstructive pulmonary disease and gastroesophageal reflux disease. Dr. Lieving noted that Claimant had been referred to Dr. Edward Setser, a thoracic surgeon, for further treatment. (*Id.*). Dr. Lieving did not mention Claimant having any psychological disorder.

Dr. Setser evaluated Claimant on January 12, 2010. (Tr. at 352-353). He documented that Claimant had no significant past medical history, and the office record reflects no complaints of psychological distress. Claimant did mention having chronic migraine headaches and reported taking Xanax and Cymbalta, an anti-depressant; however, the Cymbalta apparently was prescribed to treat paresthesia related to the schwannoma, rather than depression. (Tr. at 352, 69). Dr. Setser saw Claimant in follow-up on January 26, 2010, but no change in her condition was noted. (Tr. at 351).

---

[2] A **schwannoma** is a tumor of the nerve sheath, the tissue that covers the nerves. These tumors develop from a type of cell called a Schwann cell, which gives them their name. Schwannomas are often not cancerous (they are typically benign).They can arise from any nerve in the body, although they most often develop in certain nerves located in the head and neck, along with nerves that are involved with flexing in the upper and lower extremities. The most common symptoms of a schwannoma are painless or painful mass that is slow-growing, and electric-like shock when the affected area is felt (Tinel shock).The cause of schwannomas is unknown, but they sometimes occur in individuals with certain disorders such as some types of neurofibromatosis. Treatment may include surgery, radiotherapy and/or chemotherapy. ©**Office of Rare Diseases Research, National Center for Advancing Translational Sciences (NCATS), National Institutes of Health.**

Claimant presented to the emergency department on March 27, 2010 complaining of a migraine headache. (Tr. at 451). She also complained of depression and reported taking Cymbalta and Xanax. A review of systems failed to elicit any additional psychiatric complaints, and Claimant was not diagnosed with or treated for a psychological condition. (Tr. at 454). Two days later, Claimant returned with continued complaints related to her migraine headache. (Tr. at 446). On this visit, she had no symptoms of depression or any other psychological condition, although she was described as being "anxious." (Tr. at 449). The following day, Claimant was again seen in the emergency department due to a migraine headache. (Tr. at 441). The attending physician noted that Claimant had been to the emergency department "a lot" recently for pain–related issues; that she remembered the names and doses of pain medications she had received; and she "has actually asked for them." (Tr. at 444). Claimant reported no psychological symptoms at that time.

On April 6, 2010, Dr. Setser referred Claimant to Dr. Carl McComas, a neurologist, to evaluate her complaints of numbness and intermittent weakness. (Tr. at 350). He wrote to Dr. McComas that Claimant reported difficulty sitting up at times, although her medical imaging showed no involvement of the schwannoma with her spine. Dr. Setser did not believe Claimant's symptoms were related to the schwannoma, and requested an examination by Dr. McComas before Claimant underwent surgical removal of the mass. (*Id.*).

Claimant saw Dr. Lieving on April 8, 2010 for a recheck. (Tr. at 395). Although Dr. Lieving provided no specific rationale, he diagnosed Claimant with generalized anxiety disorder and major depressive disorder. He also decided to discontinue Claimant's prescription of Cymbalta to make sure that it is not the cause of her headaches. Dr.

Lieving agreed with the recommendation that Claimant see Dr. McComas prior to surgery. (*Id.*).

On April 20, 2010, Claimant was evaluated by Dr. McComas. (Tr. at 368-69). Claimant did not report any psychiatric history or complaints to Dr. McComas. Her physical examination was essentially normal, and an MRI scan of her brain was likewise normal. Dr. McComas indicated that he was unsure as to the nature and etiology of Claimant's complaints of numbness and intermittent muscle weakness. After looking at her thoracic films, Dr. McComas concluded that no other neurological testing was necessary. (Tr. at 369).

Claimant returned to Dr. Lieving's office on September 16, 2010. (Tr. at 392). She complained of hip, rib, and leg pain that was relieved with oxycodone. Dr. Lieving diagnosed Claimant with neuropathy, schwannoma, and generalized anxiety disorder and prescribed Neurontin. (*Id.*).

Claimant underwent nerve conduction studies at the Pleasant Valley Hospital Neurophysiology Center on October 5, 2010. The studies were interpreted by Dr. Robert Lewis. (Tr. at 464-67). With the exception of an equivocal right carpal tunnel syndrome, Claimant's tests were normal. Dr. Lewis saw Claimant four additional times between March 10, 2011 and April 17, 2012. (Tr. at 459-63, 517-34). At each visit, he noted that Claimant had a history of depression and anxiety and took Xanax, but her mental status examinations were completely normal. (Tr. at 461, 519, 526, 532). At each of these visits, Claimant denied anxiety and made no other comments regarding her psychological condition. (*Id.*). Dr. Lewis diagnosed Claimant with neck pain; skin sensation disturbance; lumbar radiculitis; neuralgia; benign neoplasm of the nervous system, stable; myelopathy; and carpal tunnel syndrome, stable. However, he never diagnosed

Claimant with any psychological disorder.

The record also contains notes documenting three additional visits with Dr. Lieving. On April 11, 2011, Dr. Lieving noted that Claimant's mental status examination was grossly normal. (Tr. at 486). She made no specific complaints related to her mental conditions. Again on May 23, 2011, Dr. Lieving documented Claimant's mental status as grossly normal and indicated that her "issues are stable." (Tr. at 490). On June 29, 2011, Claimant was seen for a pre-operative clearance, (Tr. at 491-94), requiring Dr. Lieving conduct a comprehensive review of systems. Claimant specifically denied "decreased concentration, irritability, [or] panic attacks." (Tr. at 493). Her psychiatric examination was grossly normal. Claimant was cleared for surgery, and was told to return for regular check-up in two months. (Tr. at 494).

**B.     *Psychological Evaluation***

On January 23, 2011, licensed psychologist William C. Steinhoff, M.A., conducted a clinical interview and mental status examination of Claimant for West Virginia Disability Determination Service. (Tr. at 403-07). When asked to state her chief complaints, Claimant responded, "Mostly, I've got physical problems." She told Mr. Steinhoff that she had a mass in her back that caused her legs to go numb. She also stated that she quit her job at Walmart due to pain. As far as psychological symptoms, Claimant reported frequent crying spells, low energy, depression, anger toward others, stressful memories and flashbacks of abuse. She denied panic attacks, phobias, obsessions, and compulsions. Claimant indicated that she had no history of outpatient or inpatient mental health treatment, although she admitted taking Xanax. (Tr. at 404-05). She described some mental health issues in her family; particularly, involving a brother. Claimant's educational history, vocational background, and social history were relatively

12

unremarkable.

Mr. Steinhoff then performed a mental status evaluation. (Tr. at 405-06). He found that Claimant was oriented, but depressed. She had clear speech and fair eye contact. Her thought processes were clear and coherent, but slow. Mr. Steinhoff noted Claimant's immediate and remote memory to be normal, but her recent memory (five minutes ago) was moderately impaired. Claimant's concentration was also moderately impaired when performing serial 3's. Her processing speed was slow, and her pace was mildly slow. Mr. Steinhoff noted that Claimant's persistence was moderately impaired due to her depressed mood and irritability, although her social functioning was only mildly impaired. Mr. Steinhoff assessed Claimant with Major Depressive Disorder, Recurrent, Severe, without Psychotic Features and chronic Post Traumatic Stress Disorder. (Tr. at 407).

### C.    *Psychiatric Review Technique and RFC Assessment*

On January 27, 2011, Joseph A. Shaver, Ph.D. completed a psychiatric review technique regarding Claimant, based largely upon Mr. Steinhoff's examination. (Tr. at 408-421). Dr. Shaver opined that Claimant had an affective disorder (Major Depressive Disorder, Severe) and an anxiety-related disorder. He determined that Claimant was moderately restricted in activities of daily living and in maintaining concentration, persistence or pace; had mild difficulties maintaining social functioning, and had one or two episodes of decompensation of extended duration. (Tr. at 418). He found no evidence of Paragraph C criteria.

Dr. Shaver then completed a Mental Residual Functional Capacity Assessment. (Tr. at 422-25). On a function-by-function basis, he found Claimant to be not significantly limited in fourteen areas and moderately limited in six. In the category of Understanding

and Memory, Claimant was moderately limited in her ability to understand and remember detailed instructions. In the category of Sustained Concentration and Persistence, Claimant was moderately limited in the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to maintain a schedule and be punctual; and the ability to complete a normal work week without interruption from symptoms and work at a consistent pace without unreasonable rest periods. Claimant had no limitations in social functioning, but in adaption was moderately limited in her ability to respond appropriately to changes in the work setting. Despite her limitations, Dr. Shaver concluded that Claimant "retains the mental capacity to operate in work-like situations that require only two to three step operations as well as minimal production quotas. (Tr. at 424).

## VI.    **Standard of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). Thus, the decision for the Court to make is

"not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001)). If substantial evidence exists, then the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   <u>Discussion</u>

Having thoroughly reviewed the record, the undersigned **FINDS** no merit to the challenges raised by Claimant. The undersigned further **FINDS** that the decision of the Commissioner is supported by substantial evidence.

### A.   *ALJ's Consideration of Psychologist's Evaluation*

Claimant takes issue with the ALJ's RFC assessment, arguing that the ALJ failed to incorporate the findings of Mr. Steinhoff, the agency psychologist who examined Claimant and determined that she had moderate impairments in persistence, concentration, and recent memory. Claimant additionally contends that the ALJ improperly rejected these pertinent findings, and did so without providing a logical and consistent explanation.

The ALJ first addressed Mr. Steinhoff's opinions regarding Claimant's persistence, concentration, and recent memory at step three of the sequential evaluation process. The ALJ agreed with Mr. Steinhoff that Claimant's pace was only mildly slow. He then discussed Claimant's testimony regarding her inability to concentrate and noted Mr. Steinhoff's finding that Claimant had moderate impairment in concentration. Nonetheless, the ALJ concluded that Claimant had only a mild impairment in concentration based upon other, more persuasive, evidence in the record. The ALJ emphasized that Claimant's mental status examinations by her treating physicians were

15

normal in all spheres, including her memory and fund of knowledge. (Tr. at 35). The ALJ also personally observed Claimant at the administrative hearing, noting that she had no difficulties in remembering job details dating back to 1996, readily answered the questions posed by her attorney and the ALJ, and maintained her concentration throughout the entire hearing, which lasted approximately an hour and a half. (*Id.*).

Later, when assessing Claimant's credibility and determining her RFC, the ALJ found numerous treatment records documenting Claimant's denial of psychological symptoms. As stated, the records showed normal mental status examinations, and there was no evidence that Claimant ever sought or received care from a mental health specialist. (Tr. at 39-40). The ALJ concluded that Claimant's lack of psychiatric care was significant given that she tended to pursue treatment when she needed it. Accordingly, the ALJ surmised that Claimant's psychological issues were not as limiting as she described them to be. The ALJ further expressed skepticism with Claimant's complaints of impaired memory, referring to an emergency department record in which Claimant was able to list her medications with ease and make focused requests for treatment. According to the ALJ, this notation demonstrated that Claimant was able to concentrate and "exhibit persistence enough to remember the names and dosages [of medications] during an onset of a migraine." (Tr. at 40). He also pointed to a treatment record in which Claimant stated that she was "doing well" on Xanax. The ALJ noted that Claimant's reports of psychological symptoms, as reflected in the records, were inconsistent with and contradictory to her testimony. (Tr. at 42).

Finally, the ALJ discussed the weight he gave to the agency experts. (Tr. at 41). He stated that Dr. Shaver had completed a mental residual functional capacity evaluation that generally corresponded with the evidence, although the ALJ correctly rejected Dr.

16

Shaver's finding that Claimant had two episodes of decompensation. Indeed, the record lacks any evidence of such episodes. Although neither consultant was a treating physician of Claimant, the ALJ acknowledged that agency consultants have a high level of understanding of the Social Security disability program and had access to Claimant's entire file when forming their opinions; therefore, he afforded *some* weight to the opinions of Dr. Shaver and Mr. Steinhoff.

Social Security Ruling ("SSR") 96-6p requires an ALJ to consider an agency consultant's "findings of fact about the nature and severity of an individual's impairments as opinions of nonexamining physicians and psychologists." 1996 WL 374180, at *2; *see also* 20 CFR §§ 404.1527(e), 416.1527(e). The ALJ must not ignore the findings and must explain the weight given to them. Nevertheless, the ALJ is not bound by the findings and may afford them weight only to the extent that they are supported by evidence in the case file. *Id.* In determining the supportability of an agency consultant's findings, the ALJ must consider the record as a whole and, among other things, assess the consistency of the findings with the other evidence.

When a claimant is not engaging in substantial gainful activity, but does not have an impairment or combination of impairments that meets or equals a listed impairment, the ALJ must assess the claimant's RFC. The RFC is the claimant's "*maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis." SSR 96-8p, 1996 WL 374184, at *2 (emphasis in original). The RFC assessment is an administrative finding rather than a medical finding, and is an issue reserved to the Commissioner. SSR 96-5p, 1996 WL 374183, at *5. Notwithstanding the importance of medical and psychological opinions in assessing an individual's RFC, they are only one aspect of the analysis. *Id.* The ALJ must also consider evidence of objective

medical findings, reports of daily activities, recorded observations, lay evidence, medical history, attempts to work, effects of symptoms such as pain, and the frequency, duration, and impact of medical treatment.  SSR 96-8p, 1996 WL 374184, at *5.

In this case, the ALJ fulfilled his obligations when considering and weighing the opinions of Mr. Steinhoff and Dr. Shaver. The ALJ expressly identified certain findings made by the consultants, which the ALJ felt were either contrary to the record or were plainly without evidentiary support. The ALJ specifically weighed the opinions, giving them some weight, but not affording them greater weight than evidence contained in the medical records prepared by Claimant's treating physicians. Ultimately, the ALJ's RFC assessment fairly reflected the evidence as a whole, and the ALJ provided an adequate explanation of its factual underpinnings. Consequently, Claimant's argument that the ALJ erred by failing to incorporate all of Mr. Steinhoff's findings is entirely unpersuasive.

### B.      Testimony of Vocational Expert

Claimant also attacks what she describes as the ALJ's rejection of the vocational expert's opinions. (ECF No. 11 at 3). Claimant's argument is based upon testimony elicited from the vocational expert by Claimant's attorney, after the expert identified certain jobs he felt Claimant could perform in light of the ALJ's RFC assessment. Specifically, Claimant's counsel asked the vocational expert to assume that Dr. Steinhoff's findings were correct; therefore, to assume that Claimant had moderately impaired persistence, concentration, attention, and recent memory. (Tr. at 77). Counsel inquired as to whether these impairments would affect Claimant's ability to do the jobs identified by the vocational expert. The expert expressed doubt as to what Dr. Steinhoff meant by "moderate," so counsel defined the term as "more than mild, not completely precluded, but would have an effect, substantial effect on someone." (Tr. at 78). Using that

definition, the expert opined that some, but not all of the jobs would be precluded. In follow-up, counsel asked the vocational expert to assume an additional  finding made by Dr. Shaver that Claimant's impairments would also cause her to miss some work, or some portion of a work day, every week. Based on that hypothetical, the vocational expert agreed that Claimant would not be able to perform any of the available jobs. (Tr. at 79).

Claimant's contention that the ALJ improperly disregarded this testimony is flawed for the simple reason that the testimony was not based upon a valid hypothetical question. It is well established that for a vocational expert's opinion to be relevant, it must be in response to a proper hypothetical question that sets forth all of the claimant's impairments. *Walker v. Bowen,* 889 F.2d 47, 50-51 (4th Cir. 1989). While questions posed to the expert must fairly set out the impairments, the question need only reflect those impairments supported by the record. *See Chrupcala v. Heckler,* 829 F.2d 1269, 1276 (3rd Cir. 1987). "[T]he ALJ is solely responsible for deciding the claimant's RFC and is not required to consider vocational expert testimony in response to counsel's unsupported, conclusory statements as to a hypothetical RFC." *Brooks v. Colvin,* No. 1:12-cv-189-MU, 2013 WL 5302566 (W.D.N.C. Sept. 19, 2013); *see also Parker v. Colvin,* No. 1:13–cv–00011–MOC, 2013 WL 4748409 (W.D.N.C. Sept. 4, 2013) ("[T]he fact that the Vocational Expert ("VE") responded to a hypothetical posed by counsel for plaintiff, which counsel believed was consistent with [medical] opinions, but which was not consistent with the ALJ's RFC determination is of no consequence.")

Here, the ALJ arrived at Claimant's RFC assessment after considering all of the evidence of record. In reaching that determination, the ALJ weighed Mr. Steinhoff's opinions and rejected some of them as being inconsistent with other evidence, including the objective medical findings of Claimant's treating physicians. The ALJ explicitly

disagreed with Mr. Steinhoff's opinion that Claimant was moderately impaired in recent memory, concentration, and persistence. Given that Dr. Shaver's function-by-function assessment was based largely upon Mr. Steinhoff's conclusions, to the extent Dr. Shaver's assessment involved Claimant's ability to do activities requiring sustained concentration and persistence, the ALJ discounted them by extension. Thus, Dr. Shaver's finding that Claimant was moderately impaired in her ability to complete a normal work week or work day was not considered by the ALJ to be valid and thus was not included in the RFC assessment. Because the attorney's hypothetical questions assumed impairments that were not reflected in the ALJ's RFC determination, the vocational expert's responses to those questions were neither relevant nor useful and the ALJ properly ignored them.

## VIII.  **Recommendations for Disposition**

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **DENY** Plaintiff's motion for judgment on the pleadings as articulated in her Brief in Support of Judgment on the Pleadings, (ECF No. 11), **GRANT** Defendant's motion for judgment on the pleading as set forth in her Brief in Support of Defendant's Decision, (ECF No. 12), **DISMISS** this action, **with prejudice**, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with

the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** February 7, 2014

Cheryl A. Eifert
United States Magistrate Judge